IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>    v.                                                )<br>                                                      )   Criminal No. 21-385-14<br>CAMERON SNOW,                          )<br>                                                      )<br>            Defendant.                        ) | |

**MEMORANDUM OPINION**

Presently before the Court is Defendant's Motion to Reconsider Detention Order and Grant Pretrial Release, which is opposed by the Government. (*See* Docket Nos. 460, 579, 590). After careful consideration of the parties' positions, and review of the detention hearing transcript, the evidence introduced at the hearing, (Docket Nos. 553, 590-2, 591), and the referenced Pretrial Services Report, Defendant's Motion will be denied. As required by 18 U.S.C. § 3142(i)(1), the following includes the Court's findings of fact and statement of the reasons for detention.

**I.     BACKGROUND**

   **A.   PROCEDURAL HISTORY**

On August 31, 2021, Defendant and 23 other co-defendants were charged in Count One of the Indictment in this case with conspiracy to possess with intent to distribute and distribute 400 grams of more of fentanyl, 280 grams or more of crack cocaine, a quantity of cocaine, a quantity of heroin and a quantity of fluorofentanyl, in violation of 21 U.S.C. § 846, for conduct occurring from in and around August 2019 and continuing until in and around August 2021. (Docket No. 3). An arrest warrant was issued for Defendant on September 2, 2021. (Docket No. 20).

After Defendant was arrested, he had an initial appearance on September 9, 2021, followed by an arraignment on September 24, 2021, at which time he pled not guilty to the charge. (Docket

Nos. 98, 363, 364). Defendant also had a detention hearing on September 24, 2021 before Magistrate Judge Lisa Pupo Lenihan, who entered an order of detention pending trial. (Docket Nos. 367, 368, 553).

Presently before the Court is Defendant's Motion to reconsider the detention order, in which he requests that the detention order be revoked and that he be released on bond pending trial or other disposition of this matter. (Docket No. 460). In support, Defendant contends that consideration of the factors set forth in 18 U.S.C. § 3142(g) weigh in favor of his pretrial release for the following reasons: his role in the drug conspiracy was that of a courier, which is "generally minor and not associated with violence;" "he was not found to possess weapons or large amounts of money, nor was he shown to have committed any offense which was violent against another individual;" he has strong family ties within the community, thus he is not a flight risk; the majority of his criminal history concerning violent crimes occurred when he was a juvenile, and his more recent offenses "are primarily related to personal cannabis possession" and do not demonstrate a pattern of violence which would endanger the community; and, if released, he will be accountable to his proposed third-party custodian, Faye Snow, who is his grandmother. (Docket No. 579 at 5-9).

The Government opposes Defendant's Motion, and argues that Defendant must be detained pending trial because the rebuttable presumption applies in this case based on the charge he faces, consideration of the § 3142(g) factors weigh in favor of detention, and there is no condition or combination of conditions which will reasonably assure the safety of the community if he is released. (Docket No. 590 at 6-11).

B. **EVIDENCE ADDUCED AT THE DETENTION HEARING**

At the September 24th hearing, the Government presented testimony by Federal Bureau of

Investigation Special Agent ("SA") Bryan Distelrath, who works on the Greater Pittsburgh Safe Streets Task Force.[1]  (Docket No. 553 at 9).  SA Distelrath explained that the Task Force partners with federal, state and local agencies to investigate and dismantle neighborhood street gangs.  (*Id.*).  To that end, SA Distelrath testified that he worked on an investigation related to Defendant and other individuals, including the Hazelwood Mob Down Low Gang, which is a neighborhood street gang located in the Hazelwood area of Pittsburgh (the "Hazelwood Gang").  (*Id.* at 10).  The investigation revealed that the Hazelwood Gang was involved in narcotics trafficking, firearms and violent crimes, and ultimately led to a Title III wiretap of 15 telephones.  (*Id.*).  SA Distelrath testified that intercepted communications involving Defendant generally confirmed that he was part of a conspiracy to distribute narcotics.  (*Id.* at 11).

More specifically, SA Distelrath testified that law enforcement first intercepted Defendant on co-defendant Jemeal Youngblood's phone, and their communications indicate that he and Youngblood conspired to traffic heroin, fentanyl and crack cocaine.  (Docket No. 553 at 22).  SA Distelrath testified concerning a compilation of line sheets,[2] (*see* Docket No. 591), relative to various intercepted calls involving Defendant as follows:

- A three-way call that occurred on April 21, 2021 involved Defendant, Youngblood and a female named Jada, during which Defendant accused Jada of spending his money and stated he would blow up a rental car if he did not get his money back. (Docket No. 553 at 23-24).  After Jada hung up, Defendant once again stated that he would blow up the car and said that he would "fuck [Jada] up" when he sees her. (*Id.* at 24).  Defendant further stated that he would shoot Jada in the face with his paintball gun and that she would "get her ass kicked" because she owed him $500. (*Id.*).

- In a call on April 24, 2021, Defendant and Youngblood initially discussed having

---

[1]   The September 24th hearing pertained to both Defendant and co-defendant Javon Grant.  (*See* Docket No. 553).

[2]   SA Distelrath explained that line sheets are a law enforcement officer's written summaries of telephone calls or text messages that were monitored during a Title III wiretap investigation.  (Docket No. 553 at 17, 22-23).

3

a BB gun war, but then Defendant commented that he did not have bullets in his clips and "he can't ride around with no bullets or else he'll get shot up." (Docket No. 553 at 24-25). Later in the call, Defendant and Youngblood made plans to drive around looking for college parties at Pitt and other campuses and to shoot people at the parties with BB guns. (*Id.* at 25). SA Distelrath testified that the BB guns Defendant and Youngblood discussed using could cause serious harm, such as the loss of an eye. (*Id.*).

- On April 25, 2021, Defendant indicated that he was high and asked Youngblood if he was supposed to bring a gun, to which Youngblood responded yes. Defendant stated that he did not bring a gun and, when Youngblood asked why, Defendant said that he forgot. (Docket No. 553 at 25-26).

- In a call on May 15, 2021, Youngblood said he was out of "hard" or crack cocaine, and Defendant agreed and said that he needed to get some as well. (Docket No. 553 at 27). Defendant and Youngblood discussed getting crack cocaine from a male known as Cash, and Defendant then commented that it would get busy around 9:00 or 10:00 p.m. (*Id.*). Based on SA Distelrath's training and experience, he testified that Defendant's and Youngblood's discussion about it getting busy referred to drug trafficking. (*Id.* at 27-28).

- On June 1, 2021, Defendant and Youngblood discussed the fact that co-defendant Delrico Shields recently was pursued on foot by police while he was in possession of a firearm, and that some shots were fired in the area in order to divert the police from him. (Docket No. 553 at 28). Defendant stated that the police were chasing Shields, so people went to "bang the heat," which SA Distelrath testified meant shooting guns in the air to divert the police from Shields. (*Id.* at 28-29).

- SA Distelrath testified concerning a shooting that occurred between the Hazelwood Gang and a rival Homewood gang on June 5, 2021. (Docket No. 553 at 29-31). In discussing that incident in a call on June 6, 2021, Defendant told Youngblood that "people know that they did that yesterday." (*Id.* at 31). Defendant said people run their mouth, Youngblood stated that someone named Marcus might have said something, and Defendant said he was about ready to shoot Marcus in the head. (*Id.*). According to SA Distelrath's testimony, based on the location of the June 5th shooting and Defendant's and Youngblood's June 6th conversation, he concluded that Defendant had been involved in the gang shooting that occurred. (*Id.* at 32).

- In a call on June 7, 2021, Defendant told Youngblood that he had a couple of shells but he needed more and they were available at Dunham's. (Docket No. 553 at 32-33). Youngblood then told Defendant that he was getting pulled over, at which point Defendant asked if Youngblood had the "dip," which SA Distelrath testified is another name for a firearm, and Youngblood said no. (*Id.* at 33).

- On June 11, 2021, Defendant told Youngblood that people had been hitting him for joints, including a man who had just called and said that he would buy them all

from him. (Docket No. 553 at 33). Defendant asked Youngblood how much he wanted to sell them for, to which Youngblood responded $300. (*Id.*). Based on SA Distelrath's training, experience and work on this case, he testified that Defendant's reference to joints meant heroin-fentanyl. (*Id.* at 33-34).

Defendant's presentation consisted of a proffer indicating that his grandmother, Faye Snow, is willing to serve as a third-party custodian for him. (Docket No. 553 at 52). According to the defense, Ms. Snow stays at her residence most of the time, she has a good relationship with Defendant, and she will monitor the situation and report any violations of release conditions. (*Id.*).

Following receipt of the foregoing evidence at the hearing, Judge Lenihan initially noted that the Government is entitled to a rebuttable presumption that detention is needed based on the drug trafficking offense Defendant faces, and found that Defendant's proffered release plan was insufficient to rebut the applicable presumption. (Docket No. 553 at 60, 64). In so ruling, Judge Lenihan considered the four factors required to be considered under the Bail Reform Act,[3] and determined that Defendant is a danger to the community, and there are no conditions that can be imposed which will reasonably assure the safety of the community. (*Id.* at 64, 68). Consequently, Judge Lenihan entered an order detaining Defendant pending trial or other disposition of this matter. (*Id.* at 69; Docket No. 368). Defendant's appeal of the detention order followed.

After reviewing the transcript of the detention hearing before Judge Lenihan along with the evidence introduced at the hearing, and considering the Pretrial Services Report, as well as the

---

[3] As to those factors, Judge Lenihan commented that the charged drug trafficking conspiracy offense is an extremely serious offense; the weight of the evidence against Defendant as to his involvement in the drug conspiracy is relatively strong; his criminal history goes back to 2012 and he has incurred new charges or convictions on multiple occasions while on probation for prior convictions, including the charge in the instant case; evidence presented at the hearing shows Defendant was involved in drug dealing, he has been involved with firearms and he may have been involved in a gang-related shooting, all of which demonstrates that he is a danger to the community; and his 82-year old grandmother would not be a sufficient third-party custodian given the nature of the pending charge and the fact that he was living with her when he engaged in past criminal activity. (Docket No. 553 at 61, 63-64). Judge Lenihan further found that Defendant's sister, Dajia Snow, who he proposed at the hearing as an alternative third-party custodian, also would not be a sufficient third-party custodian given the evidence elicited at the hearing concerning Defendant's alleged involvement with drug dealing and gun possession or usage. (*Id.* at 68). The Court agrees with Judge Lenihan's findings on all of these points for reasons stated herein.

5

arguments advanced by the parties in their briefing, the Court concludes that there is no condition or combination of conditions which will reasonably assure the safety of the community if Defendant is released.

## II. LEGAL STANDARD

The Bail Reform Act of 1984, 18 U.S.C. § 3141, *et seq.* (the "BRA"), governs release and detention pending judicial proceedings. Pursuant to 18 U.S.C. § 3145(b), "[i]f a person is ordered detained by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court, the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." A district court exercises *de novo* review over a detention order entered by a magistrate judge. *United States v. Delker*, 757 F.2d 1390, 1394 (3d Cir. 1985). "De novo review does not require an additional evidentiary hearing[,]" and the district court "may make its independent determination based solely upon the evidence introduced at the prior hearing." *United States v. Kolonis*, No. 2:20-cr-0146, 2020 WL 5253192, at *3 (W.D. Pa. Sept. 3, 2020) (quoting *United States v. Burgess*, No. 2:09-cr-150, 2009 WL 2038148, at *2 (W.D. Pa. July 8, 2009)); *see also United States v. Bastianelli*, Crim. No. 17-305, 2018 WL 1015269, at *4 (W.D. Pa. Feb. 22, 2018) ("The Court retains the discretion to make its determination after reviewing the record developed before the U.S. Magistrate Judge or to accept additional evidence from the parties and rule on the expanded record."). The Court may incorporate the transcript of the proceedings before the magistrate judge and does so here. *See United States v. Chagra*, 850 F. Supp. 354, 357 (W.D. Pa. 1994). As stated, the Court has reviewed the detention hearing transcript, the Pretrial Services Report and the information contained in the parties' briefing, and concludes that an additional hearing is not necessary because the record is fully developed.

As noted, the availability of pretrial release is controlled by the BRA, which provides that a defendant must be released on his personal recognizance or upon execution of an unsecured appearance bond unless the court determines that "such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b). Following a hearing, if the judicial officer finds that no condition or combination of conditions of release will reasonably assure the defendant's appearance and the safety of the community, detention must be ordered. 18 U.S.C. § 3142(e)(1). In determining whether there are conditions of release that will reasonably assure the defendant's appearance and the safety of the community, the judicial officer must consider the § 3142(g) factors concerning:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including--
>
> > (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
> >
> > (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

Certain cases raise a rebuttable presumption that no condition or combination of conditions will reasonably assure the defendant's appearance as required and the safety of the community. 18 U.S.C. § 3142(e)(3). This rebuttable presumption applies to cases, among others, in which there is probable cause to believe that the defendant committed an offense under the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, for which the maximum term of imprisonment is ten years or more. 18 U.S.C. § 3142(e)(3)(A). An indictment charging a defendant with committing an offense enumerated in § 3142(e)(3) is sufficient to establish probable cause triggering the rebuttable presumption. *United States v. Suppa*, 799 F.2d 115, 119 (3d Cir. 1986).

A defendant may rebut the presumption in § 3142(e) by producing "some credible evidence . . . that he will appear and will not pose a threat to the community." *United States v. Carbone*, 793 F.2d 559, 560 (3d Cir. 1986). The defendant's burden of production is relatively light and has been construed as easy to meet.[4] *Chagra*, 850 F. Supp. at 357 (citation omitted). If rebutted, however, the presumption does not disappear but rather "remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)." *Id.* at 358 (citation omitted). If the defendant rebuts the presumption, the burden of persuasion remains with the Government. *Id.* at 357. Thus, the Government bears the burden of proving that the defendant presents either a risk of flight or a danger to the community.[5]

---

[4] To rebut the presumption that the defendant presents a danger to the community, "he must come forward with some credible evidence that he will not continue to engage in the drug activities with which he has been charged." *Chagra*, 850 F. Supp. at 358 (citations omitted). This may be accomplished through "'testimony by co-workers, neighbors, family physician, friends, or other associates concerning the arrestee's character, health, or family situation.'" *Suppa*, 799 F.2d at 120 (quoting *United States v. Perry*, 788 F.2d 100, 115 (3d Cir. 1986)).

[5] The Government must prove by a preponderance of the evidence that the defendant is a flight risk and that no condition or combination of conditions will assure his appearance at trial. *United States v. Himler*, 797 F.2d 156, 161 (3d Cir. 1986). The Government must prove by clear and convincing evidence that the defendant is a danger to the safety of any other person or the community. *Delker*, 757 F.2d at 1399.

### III.  DISCUSSION

Initially, Defendant is charged in Count One of the Indictment with conspiracy to possess with intent to distribute and distribute 400 grams of more of fentanyl, 280 grams or more of crack cocaine, a quantity of cocaine, a quantity of heroin and a quantity of fluorofentanyl, which carries a penalty of not less than ten years and up to life imprisonment. *See* 21 U.S.C. §§ 841(b)(1)(A)(iii), 841(b)(1)(A)(vi). Defendant does not dispute that this charge raises the rebuttable presumption that no condition or combination of conditions will reasonably assure his appearance and the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(A); Docket No. 553 at 54.

Defendant attempts to rebut the presumption by highlighting that he has ties to the community and therefore is not a flight risk, his more recent offenses do not reflect a pattern of violence which would endanger the community, and conditions can be imposed to assure his appearance and the safety of the community. (Docket Nos. 553 at 52, 55-56; 579 at 2, 7-8). To illustrate, Defendant proposes that he will reside with his grandmother, Faye Snow, who is willing to serve as a third-party custodian if he is released. (Docket Nos. 553 at 52; 579 at 7-8). After reviewing the record, the Court agrees with Judge Lenihan that Defendant did not introduce sufficient evidence to rebut the applicable presumption. (Docket Nos. 368 at 2; 553 at 64). Even if Defendant had done so, however, the Court further concludes that the Government has presented clear and convincing evidence that he is a danger to the safety of the community such that pretrial detention was, and is, appropriately ordered in this case. In reaching these decisions, the Court has conducted an independent examination of the record as a whole and balanced the four factors set forth in 18 U.S.C. § 3142(g). For reasons that follow, the Court finds that the available information and proffered evidence on each of those factors weigh in favor of detention.

A.  **Nature and Circumstances of the Offense Charged**

As discussed, this case arises from an investigation related to Defendant and other individuals, including the Hazelwood Gang. (Docket No. 553 at 10). The investigation revealed that the Hazelwood Gang was involved in narcotics trafficking, firearms and violent crimes, and ultimately led to Title III wiretap intercepts of 15 telephones. (*Id.*). Intercepted communications generally indicated that Defendant was part of a conspiracy to distribute narcotics, and more specifically that he and Youngblood conspired to traffic heroin, fentanyl and crack cocaine. (*Id.* at 11, 22). As a result of Defendant's alleged involvement, he has been indicted on a charge of conspiracy to possess with intent to distribute and distribute 400 grams of more of fentanyl, 280 grams or more of crack cocaine, a quantity of cocaine, a quantity of heroin and a quantity of fluorofentanyl, (*see* Docket No. 3), which is a very serious controlled substance offense. If convicted, he faces a mandatory statutory term of not less than 10 years and up to life imprisonment. Given all of this, the nature and circumstances of the offense charged weigh strongly in favor of pretrial detention.

B.  **Weight of the Evidence**

While Defendant is presumed innocent of the charged offense, the Court agrees with Judge Lenihan that the weight of the evidence presented at the detention hearing "relative to his involvement in the conspiracy . . . is certainly strong enough." (Docket No. 553 at 61). As a general matter, the grand jury's return of the Indictment establishes probable cause that the offense occurred, and thus demonstrates that the weight of the evidence against Defendant is relatively strong. More specifically, however, the Government introduced evidence at the detention hearing of intercepted calls involving Defendant which implicate him in conspiring with Youngblood to sell crack cocaine, heroin and fentanyl. (*Id.* at 27-28, 33-34). In sum, while recognizing that

10

Defendant is presumed innocent of the charged offense, the weight of the evidence against him favors pretrial detention.

### C. **History and Characteristics of Defendant**

As to Defendant's background and characteristics, he was born and raised in Pittsburgh, Pennsylvania, and he is now 23 years' old.[6] Defendant's mother, father and two siblings live in the Pittsburgh area, and he has regular contact with those family members. Defendant is not married, and he does not have any children. As to community ties, Defendant has lived in the Pittsburgh area his entire life with his grandmother, Faye Snow, who the Pretrial Services Officer spoke with to verify his background. As discussed, Defendant proposes to resume residing with his grandmother, who is willing to serve as a third-party custodian for him if he is released. (*See* Docket Nos. 553 at 52; 579 at 2).

As for his health, Defendant characterized his physical health as good, and he reported no history of mental health conditions. Defendant has some history of substance abuse, as he began smoking marijuana three years ago and reportedly smoked it three or four times weekly until shortly before his arrest in this case. He previously completed an outpatient treatment program as part of a juvenile sentence.

Defendant's employment history is quite limited. He worked for Rothman's Awnings from December 2019 until March 2020, when he was laid off due to the COVID-19 pandemic. As detailed in the Pretrial Services Report, Defendant's mother reportedly found him a job working in the kitchen of a pizza shop if he is released. While it is laudable that Defendant's mother has

---

[6] Defendant's background, residence, family ties, employment history, physical and mental health, substance abuse history and criminal history are described in the Pretrial Services Report prepared by the United States Pretrial Services Office. The Court notes that neither party has objected to the contents of this Report relative to Defendant's history and characteristics as detailed therein.

tried to help him secure employment, the Pretrial Services Report notes that the position was not verified with the pizza shop owner. Absent the prospect of presently available legitimate employment, the Court is concerned that Defendant could be lured into returning to the drug trafficking activity with which he has been charged.

Turning to Defendant's criminal history, as Judge Lenihan observed, his criminal record began in 2012 when he was just 13 years old, and he has been charged with, or pled guilty to, new offenses three times while he was on probation for a prior case. (Docket No. 553 at 63). To begin with, Defendant incurred multiple adjudications of delinquency between ages 13 and 17, including one involving controlled substance and firearm possession. As an adult, Defendant pled guilty to theft by deception in 2019 and was sentenced to two years' probation. While on probation for that offense, Defendant pled guilty to disorderly conduct in 2020, and he was sentenced to a pay a fine. In 2020, he was charged with robbery and criminal mischief while still on probation, and those charges remain pending. Most recently, Defendant was indicted in this case while on probation for a prior offense and on bail for the pending robbery charges. Overall, Defendant's prior interactions with the criminal justice system did not deter him from engaging in additional criminal activity, nor did court-imposed conditions and supervision curb his unlawful behavior. All told, Defendant's criminal history and conduct while under court supervision weigh very strongly against pretrial release.

In analyzing Defendant's history and characteristics, the Court is cognizant that it must consider all possible conditions of release, including his proposal to reside with his grandmother, who is willing to serve as a third-party custodian. The Court appreciates that Defendant's grandmother is amenable to serving as a third-party custodian for him, but has serious concerns about such an arrangement, regardless of who would assume that role. As noted in the Pretrial

Services Report, Defendant's grandmother is 82 years old and rarely goes out. Although Defendant's grandmother is no doubt well-intentioned, the mere fact that she is willing to serve as a third-party custodian does not mean that she, or anyone else, could adequately supervise a defendant who is charged with an extremely serious drug trafficking offense. *See United States v. Bey*, Crim. No. 15-87, 2015 WL 7176340, at *5 (W.D. Pa. Nov. 13, 2015) ("[T]he mere fact that a relative or other individual is willing to serve as a third party custodian for a defendant is not sufficient to justify release on such conditions but is among the factors to be considered when evaluating whether release or detention is appropriate in a given case."). On that point, Judge Lenihan aptly observed that Defendant was living with his grandmother when he allegedly engaged in the instant offense conduct, as well as the other illicit activity that comprises his criminal history. (Docket No. 553 at 64). Consequently, it is reasonable to conclude that Defendant's grandmother may have been unaware of his past illegal activity, which suggests that it would prove to be difficult, if not impossible, for her or anyone else to adequately supervise him if he were to be released in this case.

The Court also cannot ignore Defendant's demonstrated history of engaging in criminal conduct while under court supervision as already discussed. Moreover, in contrast to the penalties of probation and payment of fines Defendant received for his prior convictions, he is now exposed to a significant term of ten years' incarceration if he is convicted at Count One, which increases the incentive to flee.[7] In light of Defendant's prior conduct while under court supervision, the

---

7  It stands to reason that a defendant who is facing a substantial period of incarceration may have a heightened incentive to flee, which the Court cannot simply ignore. *See United States v. Oliver*, Crim. No. 16-40, 2016 WL 1746853, at *9 (W.D. Pa. May 3, 2016) ("[T]he risk of Defendant's potential to flee from prosecution is heightened due to the substantial penalties he faces if convicted in this case. . . ."); *United States v. Ewell*, Crim. No. 13-125, 2013 WL 4479029, at *3 (W.D. Pa. Aug. 20, 2013) ("The potential for flight from prosecution is now greater as [the defendant] has been charged with such a serious offense and faces very severe penalties, if convicted."); *United States v. Miller*, Crim. No. 00-103-02, 2000 WL 633048, at *4 (E.D. Pa. May 9, 2000) (noting that "a serious potential penalty provides a strong incentive to flee").

13

nature of the charged drug trafficking offense and the substantial penalty he faces if convicted, this Court is not persuaded that release to a third-party custodian, electronic monitoring or other means of personal supervision would assure the safety of the community and his appearance as required in this case. *See e.g., Chagra*, 850 F. Supp. at 359-60 (given, *inter alia*, that the defendant faced minimum term of 20 years' imprisonment on drug conspiracy charge and the conspiracy involved large sums of cash, the court was not satisfied that any possible conditions of release would reasonably assure the defendant's appearance, as "[e]lectronic monitoring and other means of personal supervision . . . only notify authorities that the defendant is already fleeing"). Overall, the Court finds that Defendant's history and characteristics weigh in favor of pretrial detention.

### D. Nature and Seriousness of Danger to Any Person or the Community if Released

The final factor requires consideration of the nature and seriousness of the danger to any person or the community if Defendant is released. As to this factor, this Court has explained that:

> [it] agrees with others which have observed that drug trafficking poses a substantial risk of harm to the community, particularly the trafficking of significant quantities of a dangerous, addictive drug such as cocaine as alleged to have occurred here. *See Bastianelli*, 2020 WL 1015269, at *8 ("Drug trafficking certainly poses a substantial risk of harm to the community, particularly the trafficking of significant quantities of very dangerous and addictive drugs [ ]."); *United States v. Gibson*, 481 F. Supp. 2d 419, 423 (W.D. Pa. 2007) ("[V]iolence is not the only danger to the community this court must consider. The court must also consider the danger of trafficking in illicit drugs."). Distribution of Schedule II controlled substances like cocaine[8] have a "high potential for abuse" and that abuse "may lead to severe psychological or physical dependence." *See Bastianelli*, 2018 WL 1015269, at *8 (citing 21 U.S.C. § 812(b)(2)(A), (C)). Accordingly, the high volume of cocaine allegedly trafficked in this case presents a considerable danger to the safety of the community.

---

[8] Here, Defendant is charged at Count One of the Indictment with conspiracy to possess with intent to distribute and distribute 400 grams of more of fentanyl, 280 grams or more of crack cocaine, a quantity of cocaine, a quantity of heroin and a quantity of fluorofentanyl. (Docket No. 3). Like cocaine, crack cocaine and fentanyl are Schedule II controlled substances, whereas heroin and fluorofentanyl are Schedule I controlled substances. *See id.; see also* 21 U.S.C. § 812. Schedule I controlled substances have "a high potential for abuse" and "no currently accepted medical use in treatment in the United States." 21 U.S.C. §§ 812(b)(1)(A), (B).

> Ultimately, consideration of this factor requires a court to "*predict* whether defendant will engage in drug trafficking if released pending trial." *United States v. Bratcher*, Crim. No. 14-28, 2014 WL 1371582, at *8 (W.D. Pa. Apr. 8, 2014) (emphasis in original) (citing *Perry*, 788 F.2d at 114 ("[T]he dangerousness determination involves a prediction of the detainee's likely future behavior.")). The Court recognizes, as others have, that strict conditions of release, including conditions such as home confinement and electronic monitoring, cannot guarantee that a defendant will no longer engage in criminal activity. *See e.g.*, *Bastianelli*, 2018 WL 1015269, at *8 (citing *United States v. Yarbough*, No. 2:14-cr-270-11, 2014 WL 7343839, *4 (W.D. Pa. Dec. 23, 2014) ("If released to home detention, nothing prevents Defendant from continuing to engage in illegal activity.")).

*United States v. Araiza-Vega*, Crim. No. 20-218, 2020 WL 6546136, at *8 (W.D. Pa. Nov. 6, 2020).

These observations concerning the substantial risk of harm to the community posed by drug trafficking equally apply in Defendant's case. Further, as Judge Lenihan explained, evidence presented at the detention hearing indicates that Defendant was involved in drug dealing, as well as firearms. (Docket No. 553 at 25-28, 32-34, 63). The Court cannot overlook the obvious danger to the community posed by the combination of drug trafficking and firearm possession as shown by the evidence introduced in Defendant's case.[9] *See Oliver*, 2016 WL 1746853, at *9 ("[T]he utilization of firearms in furtherance of drug trafficking poses a significant threat of violence."). Additionally, the Court observes that Defendant apparently was not deterred by the sentences he received for his past crimes and/or the conditions imposed upon him in his prior cases as evidenced by the fact that he continued to engage in illegal conduct and ultimately the serious criminal activity charged here, which suggests that he may be inclined to repeat his illicit activity if released.

---

9  The Court also considers that the Government presented evidence of intercepted calls involving Defendant wherein he suggested engaging in violence toward others, such as asserting or threatening that he would harm or shoot people (*i.e.*, individuals identified at Jada and Marcus and people attending college parties), as well as evidence indicating that he may have been involved in a gang-related shooting incident. (*See* Docket No. 553 at 23-25, 29-32). In the Court's estimation, this evidence further indicates that Defendant would pose a danger to the safety of the community if he were to be released.

15

All told, based on the serious nature of the charge here, along with all of the other factors the Court has considered, the Court finds that the weight of the evidence is such that Defendant's release on bond would pose a serious risk of his continued drug trafficking and other criminal activities. As such, this final factor weighs in favor of pretrial detention.

In sum, after considering the record as a whole, including the nature and circumstances of the serious drug offense charged, the weight of the evidence against Defendant, his history and characteristics, the nature and seriousness of the danger to the community posed by his release, and the rebuttable presumption, which retains evidentiary weight, there is no condition or set of conditions which will reasonably assure the safety of the community if Defendant is released pending trial or other disposition of this matter. Accordingly, pretrial detention was, and is, appropriately ordered.

### IV. CONCLUSION

Given the Court's finding that no condition or combination of conditions will reasonably assure the safety of the community if Defendant is released, Defendant's Motion to reconsider and revoke the detention order is denied.

An appropriate Order follows.

*s/ W. Scott Hardy*
W. Scott Hardy
United States District Judge

Date:   January 28, 2022

cc/ecf:   All counsel of record
          United States Marshal